333 F.2d 239
 Llewellyn HEARD (Deceased), Standard Oil Company, a Corporation of Indiana, Assignee, Substituted, Appellant,
v.
William P. BURTON, Herman S. Kaufman, Philip A. Lefrancois and Earl W. Riblett, Appellees.
 Patent Appeal No. 7212.
 United States Court of Customs and Patent Appeals.
 June 25, 1964.
 
 Edward B. Beale, Washington, D. C. (Arthur G. Gilkes, Douglas G. Brace, Chicago, Ill., of counsel), for appellant.
 John C. Quinlan, New York City (Marylin Klosty, New York City, James W. Clement, Ernest Cheslow, Max Dressler, Chicago, Ill., of counsel), for appellees.
 Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.
 RICH, Judge.
 
 
 1
 This appeal is from the decision of the Patent Office Board of Interference awarding priority of invention to Burton et al., the senior party. The junior party, Standard Oil Company (Indiana) substituted as assignee for Llewellyn Heard, deceased, appeals. The junior party will be called "Standard."
 
 
 2
 Burton et al. are involved in this interference on application serial No. 283,997, filed April 23, 1952. Standard is involved on application serial No. 504,793, filed April 29, 1955, which is a continuation-in-part of serial No. 416, 415, filed March 15, 1954.
 
 
 3
 Burton et al. took no testimony and relied for priority solely on their 1952 filing date. Standard took testimony and submitted notebook records to prove conception and reduction to practice prior to appellees' filing date. The board held Heard's evidence failed to establish either conception or reduction to practice and therefore awarded priority to Burton et al.
 
 The sole count reads:
 
 4
 "A process for reforming naphthas which comprises subjecting a naphtha under reforming conditions to contact with a catalyst comprising platinum on eta alumina." [Emphasis ours.]
 
 
 5
 The essence of the invention is using eta-alumina, a specific type of hydrated aluminum oxide, as support material for platinum in the reforming process. Appellees' brief describes reforming as "the conversion of low octane gasoline, or naphtha, to high octane gasoline."
 
 
 6
 By way of background, we quote from appellant's brief (all emphasis ours):
 
 
 7
 "The first commercially practiced reforming process using a platinum-on-alumina catalyst was the Platforming process * * *. The catalyst * * * [used therein] and the attractiveness of such a process stimulated the inventive efforts of other scientists in the field, particularly in an effort to develop a regenerative-type platinum-alumina catalyst. The * * * [prior art] describes various procedures for preparing the catalyst including several methods for preparing the alumina support and methods for incorporating the platinum and halide, as a promoter, in the support. The support, by reason of the methods taught in the patent for its preparation, was recognized by those skilled in the art as a gamma-type alumina.
 
 
 8
 "The gamma species of alumina is one of a family or series of closely related, nearly anhydrous forms of alumina which do not occur in nature but which are produced synthetically. [Footnote omitted] These nearly anhydrous forms of alumina [which include both gamma and eta types] containing small amounts of combined water (2% or less) represent relatively stable transformation phases in the thermal dehydration of alumina hydrates by drying and calcining. The ultimate dehydrated form is the crystalline anhydrous alumina known as alpha-alumina. The alumina hydrates or `precursors' of the aluminas are prepared by first forming an aqueous sol of hydrous alumina (aluminum hydroxide) from aluminum metal or a salt of aluminum. The sol is coagulated to precipitate from solution the hydroxide or hydrate in the form of a gel. Depending upon the conditions employed, alumina monohydrates or trihydrates may be formed in the gelatinous mass. The gel then may be dried and calcined at elevated temperature (800° to 1000°F.) to obtain a highly porous adsorbent alumina of high surface area having value as a support in heterogeneous catalysis.
 
 
 9
 * * * * * *
 
 
 10
 "Eta-alumina was first so-named in an article published * * * in July of 1950 * * *. The article reviewed the thermal decomposition of four alumina hydrates, namely, alpha-alumina trihydrate (gibbsite), beta alumina trihydrate (bayerite), alpha-alumina monohydrate (boehmite) and beta-alumina monohydrate). Eta-alumina appeared as a phase in the dehydration of the betatrihydrate.
 
 
 11
 "The authors described use of x-ray diffraction analysis to distinguish seven phase transformations [footnote omitted] in the thermal decomposition of these hydrates and thereby identify a series of distinct x-ray diffraction patterns [one of which is for eta-alumina] in the region which previously had been designated loosely as gamma-alumina."
 
 
 12
 Appellant Standard's case for priority is predicated on activities of the inventor, Heard, in 1949-50 wherein Heard allegedly made catalysts of platinum on eta-alumina, although he did not at the time know or identify the alumina as eta-type.[1] Such catalysts were used in pilot plant reforming processes and found to be effective. Standard asserts that notwithstanding the fact Heard did not know in 1949-50 that the alumina of his catalyst support was eta-alumina, this is not fatal to his case since the support material he did make was reproducible and in fact contained eta-alumina, though such fact was established after Burton et al.'s filing date.
 
 
 13
 Appellees' position is that appellant's evidence of activity in 1949-50 fails to prove conception and reduction to practice since appellant never knew he had eta-alumina as catalyst support and, indeed, did not appreciate that he had a new form of alumina, by whatever name called. Further, appellees argue that tests made after appellees' filing date to establish the presence of eta-alumina in samples made in 1949-50 are of no moment since conception and reduction to practice cannot be established nunc pro tunc.
 
 
 14
 Before considering the merits of appellant's arguments regarding conception and reduction to practice, we are faced with a threshold issue of whether appellant's notebook records of 1949-50 are admissible as evidence under the so-called "decedent's exception" to the hearsay rule. Heard died in 1957 before the declaration of this interference.
 
 
 15
 Appellant argues that "a long-established exception to the hearsay rule exists in favor of the decedent Heard's records made in the course of business"; that such exception is "not to be confused with the so-called `shop book' rule." Appellees contend there is no "decedent's exception" recognized in evidentiary interference law; that appellant must comply with the usual requirements of corroboration notwithstanding the death of Heard; and that in any event appellant's notebook records do not qualify as entries made "in the course of business." We find it unnecessary to consider this issue since, assuming arguendo all of appellant's evidence is admissible and probative, he cannot prevail for reasons hereinafter set out.
 
 
 16
 We turn to consideration of the chronology of events relied on by Standard to establish Heard's conception and reduction to practice. Heard was working in 1949-50 on synthesizing platinum-alumina compositions with a view to finding improved catalysts for naphtha reforming. His work included making compositions by adding a solution of platinum compound to an alumina sol, drying the mixture and calcining the composite to form porous alumina mass on which platinum is finely distributed.
 
 
 17
 While preparing catalyst of alumina and platinum by a method described in the prior art, Heard in 1949 accidently made what he described as "ammonia aged" catalyst which was subsequently tested and found effective in reforming naphtha. Apparently such "ammonia aged" catalyst contained eta-alumina, although Heard concededly did not know it at the time. In fact, there is nothing of record to indicate that Heard considered such catalyst to be anything other than what the prior art taught — gamma-alumina and platinum, even though it was considered an "effective catalyst." After several reforming runs on naphtha, the catalyst was stored in a locked cage along with spent catalysts.
 
 
 18
 In 1954, almost 2 years after appellees' filing date, research personnel at Standard had reason to suspect that the "ammonia aged" catalyst of 1949 contained eta-alumina. A sample was removed from storage, subjected to x-ray diffraction analysis, and the presence of eta-alumina was confirmed.
 
 
 19
 In 1950, Heard made other catalysts by "ammonia aging." The record shows that such catalysts, in the preparatory stage, contained beta trihydrate alumina (bayerite), a precursor of eta-alumina. Appellant alleges that upon calcination of bayerite, eta-alumina formed so that his 1950 catalysts inherently contained eta-alumina. As with the 1949 catalyst, the record shows that Heard was not aware that he had made a new form of alumina, much less eta-alumina, notwithstanding that the catalyst was analyzed for surface area, pore structure, and platinum and fluorine content. See footnote 1, supra. In reforming tests, the catalysts proved highly effective and were reported as "one of the most active reforming catalysts prepared to date."
 
 
 20
 X-ray diffraction tests made in 1961, some 9 years after appellees' filing date, established that samples of the 1950 catalyst contained eta-alumina.
 
 
 21
 Still other catalysts were made in 1950, some of which, on X-ray diffraction analysis after appellees' filing date, were found to contain eta-alumina. But in no instance did Heard appreciate in 1950 that his catalysts contained a new form of alumina. In fact one witness, Dr. Ehrhardt, pointed out, as the board noted, that "in the period 1949 to 1951, no attempt was made to distinguish the different forms of alumina which were reported as gamma * * *; that the X-ray procedures in this period were not adapted to detect eta-alumina * * *." (Emphasis ours.)
 
 
 22
 Based on Heard's 1949-50 activities the board concluded:
 
 
 23
 "To prove conception, Heard must establish by a preponderance of the evidence that he was in possession of the invention of the count prior to his opponent's record date. This means that Heard must satisfactorily prove that he was in possession of the eta-alumina limitation of the count, inter alia, prior to Burton et al's record date. As pointed out above, the eta-alumina limitation of the count is its vitalizing feature and cannot be disregarded.
 
 
 24
 "The record, as briefly reviewed above, makes it abundantly clear that not only Heard but also no one else in Standard's employ knew, prior to Burton et al's. record date, that the above mentioned "ammonia-aged" catalysts contained eta-alumina. Since Heard did not know or realize until late 1953, long after Burton et al's. filing date, that eta-alumina was necessary to carry out the process of the count, he did not have a prior conception of the invention herein and this is fatal to his case for priority; Jacobs et al. v. Buxton, 30 CCPA 987, 135 F.2d 237, 553 OG 178, 57 USPQ 302.
 
 
 25
 * * * * * *
 
 
 26
 "In the instant case, in 1949-1950, there was no identification of eta-alumina in the catalysts but only gamma-alumina or Boehmite or Bayerite. Eta-alumina in the catalysts was not known to Heard and his associates until long after Burton et al's. filing date. This knowledge came too late.
 
 
 27
 * * * * * *
 
 
 28
 "Counsel for Heard contends that since eta-alumina was not known until the article * * * [of July, 1950] appeared, that excuses the lack of analysis for eta-alumina. The argument falls of its own weight since such an analysis could have been made anytime prior to Burton et al's. filing date. * * *
 
 
 29
 "To summarize at this point, the foregoing discussion amply and clearly demonstrates that Heard had no conception of the invention of the count prior to Burton et al's record date. On this ground alone Heard cannot prevail in this proceeding."
 
 
 30
 Appellant argues that the board erred in requiring that for conception Heard must have known his catalyst contained, by name, eta-alumina; that Heard had in fact a "complete concept * * * of an effective operative means, namely, an ammonia-aged alumina * * * which he found had beneficial value as a support for platinum in naphtha reforming"; that "The only thing lacking was mere `name'"; and that "the skilled in the art would have had no difficulty in recognizing the identity of the catalyst made by Heard through the method by which it was prepared."
 
 
 31
 Notwithstanding appellant's arguments, we sustain the board since we are not convinced Heard had such a "definite and permanent idea of the complete and operative invention" (see Townsend v. Smith, 36 F.2d 292, 17 CCPA 647), as to constitute conception within the meaning of the patent law. We agree with appellees' statement in their brief:
 
 
 32
 "For appellant to show that he had an invention in 1950, it must be proved that Dr. Heard knew (i) he had a better catalyst carrier than gamma alumina, (ii) the improved catalyst carrier contained a crystalline form of alumina different from gamma alumina, and (iii) it was the other crystalline species (whether alone or mixed with gamma) which was responsible for the improvement he claimed to have found."
 
 
 33
 We agree with appellant that it is irrelevant that Heard never referred to or appreciated the support material to be eta-alumina or to contain eta-alumina by that name. Nor do we interpret the board's opinion as so requiring. However, we consider it fatal to appellant's case that not until after appellees' filing date did Heard recognize that his "ammonia-aged" catalyst, as appellees put it, "contained any different form of alumina at all!"
 
 
 34
 We point out, as does appellees' brief, that the count calls for a particular form of alumina and we think that appellant's failure to recognize that he had produced a new form, regardless of what he called it, is indicative that he never conceived the invention prior to appellees' filing date.
 
 
 35
 It is not enough that, viewed after the fact, appellant's catalyst compositions were "reproducible." Appellant never appreciated what he had, viz., a new form of alumina, a conclusion bolstered by the fact that appellant relegated the spent catalysts to storage cages where they would no doubt have remained but for Standard's renewed interest after appellees' filing date.
 
 
 36
 We agree with appellees that this case is controlled by the precedents holding nunc pro tunc reduction to practice to be defective. As appellees say in their brief, "The nunc pro tunc reduction to practice doctrine is such a well established part of our patent law as to require no citation of authority. * * * This doctrine is controlling here. In the present case it is the recognition and appreciation of the invention which was lacking to Dr. Heard prior to April 23, 1952 [appellees' filing date], and which Heard attempts now to provide by his later tests and acts after that date."
 
 
 37
 To sum up: appellant has proved neither conception nor reduction to practice prior to appellees' filing date. Priority was properly awarded to appellees.
 
 
 38
 The decision of the board is affirmed.
 
 
 39
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 It appears from the record that the only way eta-alumina is identifiable, is by its x-ray diffraction pattern